# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JASON S. SMITH,

                    Plaintiff,

-vs-                                                    Case No. 6:10-cv-1478-Orl-31KRS

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.
_____

# REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Jason S. Smith, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. Nos. 12, 13.  The case has been referred to the undersigned for issuance of a Report and Recommendation.

## I.      PROCEDURAL  HISTORY.

In 2009, Smith applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42

U.S.C. § 1381, *et seq.* (sometimes referred to herein as the Act). He alleged that he became disabled on November 20, 2006. R. 99-104. Smith's applications were denied initially and on reconsideration. R. 39-40, 43-50.

Smith requested a hearing before an administrative law judge (ALJ). R. 61. An ALJ held a hearing on February 23, 2010. Smith, represented by an attorney, testified at the hearing. Robert Bradley, a vocational expert (VE), also testified. R. 21-35.

After considering the testimony and the medical evidence presented, the ALJ determined that Smith was insured under OASDI through June 30, 2008. R. 10. The ALJ found that Smith had not engaged in substantial gainful activity since November 20, 2006, the alleged onset date of his disability. *Id.*

The ALJ concluded that the medical evidence showed that Smith had obesity, asthma and bipolar disorder, which were severe. R. 10. The ALJ concluded that Smith's mental impairment would result in mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and mild episodes of decompensation. These impairments did not meet or equal any of the impairments listed in the applicable social security regulations. R. 11.

The ALJ found that Smith had the residual functional capacity (RFC) to perform medium work limited to "simple, routine, repetitive tasks, with limited contact with the co-workers and the public." R. 11.

In reaching this conclusion, the ALJ stated that he carefully read and considered all of the evidence even though each item of evidence was not cited in his decision.  R. 13.  He found Smith's testimony about the limitations arising from his impairments was not totally credible, citing specific examples of evidence in the record supporting that determination.  R. 13-14.

Relying on the categorization of Smith's past relevant work provided by the VE, the ALJ concluded that Smith could return to that work as actually performed.  R. 14. The ALJ also wrote that "there are other jobs existing in the national economy that [Smith] is able to perform[,]" but he did not identify these jobs.  R. 15.  Based on the finding that there were jobs that Smith could perform, the ALJ concluded that Smith was not disabled.  R. 15.

Smith requested review of the ALJ's decision. R. 96.  On August 30, 2010, the Appeals Council issued a decision finding no basis to change the ALJ's decision.  R. 1-3. Smith timely sought review of this decision by this Court.  Doc. No. 1.

## II.     JURISDICTION.

Plaintiff having exhausted his administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last

for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that

results from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42

U.S.C. §§ 423(d)(3),1382c(a)(3)(D).  In a case seeking disability benefits under OASDI,

the claimant also must show that he or she became disabled before his or her insured

status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1);

*Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (per curiam).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that

must be followed in determining whether a claimant is entitled to benefits.  In sum, an

ALJ must apply the following criteria, in sequence:

(1)     Is the claimant presently unemployed?

(2)     Is the claimant's impairment severe?

(3)     Does the claimant's impairment meet or equal one of
        the specific impairments set forth in 20 C.F.R. Part
        404, Subpart P, Appendix 1?

(4)     Is the claimant unable to perform his or her former
        occupation?

(5)     Is the claimant unable to perform any other work within
        the  economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above

questions leads to either the next question, or, on steps three and five, to a finding of

disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v.*

*Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id.* at 1278 n. 2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.

*Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment.  *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law.  *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## IV.    STATEMENT OF FACTS.

After a thorough review of the record, I find that the pertinent facts are generally adequately presented in the decision of the ALJ and the parties' memoranda.  Therefore, I will only summarize the evidence to protect Smith's privacy to the extent possible.

*A.      Personal Information and Work History.*

Smith was born in 1984.  R. 24  He received a GED and attended some college.  R. 24.

The VE described Smith's past relevant work as follows:  retail sales clerk, a light duty, semi-skilled job; merchandise deliverer, a medium duty, unskilled job; cashier two, a light duty, unskilled job; and dishwasher, a medium duty, unskilled job.  R. 24; *see also*

R. 117-18, 125-27.  The VE was not asked to render an opinion whether Smith could perform these jobs or other jobs available in the national economy considering his RFC.

    B.    *Medical Records.*

    In August 2007, Smith was involuntarily hospitalized after attempting to attack a teacher and threatening to kill himself.  R. 297.  Issues addressed during the hospitalization included bipolar disorder, depression and intermittent explosive disorder.  Smith was stable when he was discharged on August 22, 2007.  R. 297.  A follow-up appointment was scheduled at ACT Corporation (ACT).  R. 298.

    In February 2008, Smith had his initial appointment at ACT.  He reported irritability, tongue-biting and being verbally abusive.  R. 203.  An ARNP's initial assessment was bipolar disorder not otherwise specified and rule out intermittent explosive disorder and depressed personality.  R. 267.  However, on initial assessment by a doctor, whose name is illegible, the assessment was that Smith suffered from bipolar disorder not otherwise specified and mild mental retardation with a global assessment of functioning (GAF) score of 40-45.[1]  R. 204, 267.  Smith continued to be

---

[1]    The Global Assessment of Functioning, or GAF Scale, is a numeric scale that mental health physicians and doctors use to rate the occupational, psychological, and social functioning of adults.

*McCloud v. Barnhart*, 166 F. App'x 410, 413 n.2 (11th Cir. 2006)(quoting the Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (Text Rev., 4th ed. 2000) (*DSM-IV*)).  A GAF score between 41 and 50 reflects: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.*  A rating between 31 and 40 reflects:  "Some impairment of reality testing or communication (eg, speech is at times illogical, obscure, or irrelevant) OR major

treated at ACT with medication through November 19, 2008. R. 205-07. As of November 2008, the only complaint was that Smith was sleeping too long. Medication was adjusted. During his treatment at ACT, his GAF scores remained at 40-45. *See, e.g.,* R. 204, 259, 265-66, 268.

In June 2008, Robert Mosca, D.O., examined Smith. Smith reported that he was doing well with use of medication for his bipolar disorder. R. 195. He requested assistance in losing weight. *Id.* Dr. Mosca's assessment was the Smith had a bipolar affective disorder with depression in remission and that he was obese. R. 196.

On April 7, 2009, Alvin Barber, D.O., examined Smith at the request of the SSA. Smith reported that he was manic depressive and that his legs gave out periodically. R. 208. He also reported fatigue and cramps and weakness in his legs with muscle and joint pain. R. 209. Upon examination, Dr. Barber observed that Smith was 70" tall and weighed 325 pounds. R. 209. Smith "was able to sustain fluent, coherent, and intelligent speech." R. 210. Deep tendon reflexes were absent in all extremities. *Id.* He walked with a slow wide broad gait. R. 211. He was alert, oriented, with a normal affect, no memory deficit and adequate cognitive functioning. R. 211. Dr. Barber's impression was bipolar disorder, on medication and morbid obesity. He opined that Barber would walk, stand and sit for reasonable periods of time. He noted that obesity and its symptoms might be exacerbated by excessive weight. R. 211.

--------

impairment in several areas, such as work or school, family relations, judgment thinking, or mood (eg, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id.*

Malcolm J. Graham, III, Ph.D., a clinical psychologist, examined Smith on April 8, 2009 at the request of the SSA. Smith reported that he had a problem "'controlling my rage.'" R. 218. He indicated that he quit school in the tenth grade because he was getting into fights. He never attended special education classes. *Id.* He volunteered at Habitat for Humanity about three hours a day, two days a week. He drove himself to the examination. R. 219-20. He was first diagnosed with bipolar disorder in September 2007, after being hospitalized in a psychiatric unit "when he 'smashed somebody's skull into a brick wall.'" R. 219. He was taking prescribed medication. Upon examination, Dr. Graham observed that Smith's affect was appropriate with no depression or anxious mood. After testing, Dr. Graham found that Smith had no problems in attention or concentration, his memory was intact and he could relate information in a rational, coherent, and sequential fashion. R. 219. Dr. Graham's diagnosis was bipolar disorder by report and obesity with a GAF score of 70-80.[2] R. 220.

On April 28, 2009, Michael Zelenka, Ph.D., prepared a mental functional capacity assessment after review of Smith's records. He opined that Smith would have mild restrictions of activities of daily living and in maintaining concentration, persistence or pace, and moderate difficulties in maintaining social functioning. R. 235. More specifically, he would be moderately limited in the ability to maintain attention and

---

[2] A GAF score between 61 and 70 is defined as some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupation, or school functioning (e.g., occasional truancy, or theft within the household) but generally functioning pretty well with some meaningful interpersonal relationships. *DSM-IV* at 32. A GAF rating between 71 and 80 reflects no more than slight impairment in social, occupation, or school functioning. *Id.*

concentration for extended periods and accept instructions and respond appropriately to criticism from supervisors. R. 222. He would not be significantly limited in the ability to carry out simple and detailed instructions, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, make simple work-related decisions, sustain an ordinary routine without special supervision and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 221-22.

On August 11, 2009, Val Bee, Psy. D., prepared a psychiatric review technique form after review of Smith's records. Dr. Bee concluded that Smith would have mild restriction of activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence and pace. R. 290. Dr. Bee noted that Smith admitted "I'm lazy" in reports to the SSA. R. 292.

C.     *Statements Regarding Smith's Functional Limitations.*

Smith testified that he was kicked out of his house in 2007. He sought job training at Job Corps, but he was kicked out of that program due to the altercation that resulted in his involuntary hospitalization. R. 25, 28. After being discharged from the hospital, he moved to Florida to live with his grandmother, where he still resided. R. 26.

At the time of the ALJ's hearing, Smith did not have any shortness of breath. Leg problems were being treated with a muscle tremor reducer. R. 27. Medication had caused him to gain weight. R. 29. He reported that he was depressed with infrequent manic episodes in which he had an intention to commit suicide. R. 28. He sometimes

had problems with rage, as reflected in the incident at Job Corps.  He did not respond well to criticism and had problems with authority figures.  R. 31-32.  Smith testified that medication did "a sufficient job" controlling his rage, but that it was not entirely out of his system.  R. 33.

During a typical day, he would take care of his personal hygiene then do housework as directed by his grandmother.  He could drive and shop for groceries.  R. 32.  He played cards, used a computer and socialized with others.  *See, e.g.* 170.

Smith's grandmother prepared a written function report.  She indicated that Smith sometimes had trouble completing tasks and took longer than normal because his attention span was short.  R. 171.  She reported that Smith did not take criticism well and had low self esteem.  R. 172.  She observed that Smith's volunteer work "was very good for him as it got him out with people and [he] had to follow instructions."  R. 173.  She expressed her belief that Smith should get job training.  *Id.*

In July 2009, Smith was hospitalized for asthma exacerbation.  He was discharged with medication.  R. 247.  Theodossis Zacharis, M.D., noted on July 24, 2009, that Smith had quit smoking.  R. 273.

## V.    ANALYSIS.

Smith makes a number of interrelated arguments.  He asserts, essentially, that the ALJ erred by failing to consider his GAF scores and by failing to include moderate limitations in concentration, persistence and pace in his RFC finding, which resulted in errors regarding the work that he could perform.  He contends, also, that the ALJ failed to develop the record sufficiently.  He asks for an award of benefits.  These are the only

issues I will address.[3]

> A.    *Weight Given to GAF Scores.*

Smith argues that the ALJ erred by failing to recite various GAF scores in the record and state the weight given to each score.  The Commissioner argues that the law does not require the ALJ to do so when, as here, the ALJ represents that he carefully reviewed the records before him and there is no indication that the ALJ misunderstood any GAF score.

Smith relies on a number of cases in support of his argument.  None of these cases is factually similar to the present case.

In *McPhadden v. Astrue*, No. 1:07-cv-15-MP-WCS, 2007 WL 4403210 (N.D. Fla. Dec. 17, 2007), the Court reversed the decision of the Commissioner because the ALJ relied on one GAF score as a basis to find that the claimant was not credible while failing to discuss other GAF scores that showed the claimant had more serious functional limitations.  *Id.* at * 10.  Similarly, in *Hall v. Commissioner*, No. 2:05-cv-559-FtM-29SPC, 2007 WL 4981325 (M.D. Fla. Feb. 9, 2007), the ALJ selectively relied on certain GAF scores while ignoring other GAF scores that reflected more serious impairments.  *Id.* at * 11-12.  In contrast, in the present case, the ALJ did not selectively rely on certain GAF scores while ignoring other GAF scores.

In *McCloud v. Barnhart*, 166 F. App'x 410 (11th Cir. 2006), the court found that the ALJ erred when he incorrectly concluded that a GAF score of 41-50 reflected only

---

[3]  The parties were advised that issues not specifically raised would be waived. Doc. No. 14 at 2.

moderate symptoms.  The court noted that these scores indicated severe impairments. *Id.* at 418.  There is no indication in the present record that the ALJ misinterpreted the GAF scores.

In *Clements v. Astrue*, No. 3:08-cv-65-J-HTS, 2009 WL 260980 (M.D. Fla. Feb. 4, 2009), the court found that the ALJ erred in his decision not to give substantial weight to the opinion of a treating physician based on the reference to a single GAF score in the record, which score appeared, based on the record as a whole, to be a typographical error.  *Id.* at * 4-5.  Once again, these facts are distinguishable from the present case because Smith does not contend that the ALJ erred by failing to give substantial weight to the opinion of a treating physician.

A GAF score is part of a professional's opinion regarding the nature and severity of a claimant's impairment.  The ALJ is required to consider those scores as part of the record as a whole.  It would, however, be unreasonable to require an ALJ to state in his decision every finding in every medical record before him and state the weight given to each finding.  The Eleventh Circuit decision in *Winschel v. Commissioner*, 631 F.3d 1176, 1179 (11th Cir. 2011), does not impose such a requirement.  Rather, in that case a panel of the Eleventh Circuit faulted the ALJ for "not discuss[ing] the pertinent elements of the treating physician's medical opinion" and stating the weight given to the opinion. As noted, in this case Smith does not contend that the ALJ erred in evaluating the weight given to opinions of treating and examining professionals.

Because the ALJ indicated that he carefully reviewed the records before him, and there is no indication that he overlooked or misconstrued any GAF score, I recommend

that the Court find that the ALJ did not err by failing to include the GAF scores in his decision or by failing to state the weight he gave to each score.

      *B.    Moderate Limitations in Concentration, Persistence and Pace.*

      The ALJ concluded that Smith would have moderate difficulties in maintaining concentration, persistence or pace.  R. 11.  He relied on the opinion of Dr. Graham, an examining psychologist, and the mental RFC assessment by reviewing physicians to conclude that Smith could perform simple, routine, repetitive work despite his mental impairment.  R. 13-14.  The ALJ noted that Dr. Graham found after testing that Smith had no problems in attention or concentration.  R. 14.

      In *Winschel*, the Eleventh Circuit required at step five of the sequential evaluation that the ALJ include limitations in concentration, persistence and pace in a hypothetical question to a VE.  631 F.3d at 1181.  The present case was resolved at step four of the sequential evaluation.  An ALJ is not required to rely on a VE in determining whether a claimant can return to his past relevant work.  *See Lucas v. Sullivan*, 918 F.2d 1567, 1573 n. 2 (11th Cir. 1990).  Thus, the ALJ did not err by failing to pose a hypothetical question to the VE regarding the work Smith could perform in light of his RFC.

      The *Winschel* court also noted that "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that . . . unskilled work sufficiently accounts for such limitations."  631 F.3d at 1180.  In this case, the ALJ cited medical evidence in the record -- specifically the opinions of Dr. Graham and Dr. Zelenka -- that demonstrated that Smith could perform simple, routine, repetitive tasks even with

moderate limitations in concentration, persistence and pace. Notably, Smith does not

argue that his past unskilled work requires the ability to perform complex tasks.

Under these circumstances, I recommend that the Court find that the ALJ did not

err because substantial evidence supports the ALJ's conclusion that Smith could perform

simple, routine, repetitive tasks even with moderate limitations in concentration,

persistence and pace.

C.    *Development of the Record.*

Smith contends that the ALJ erred by failing to investigate facts and develop

arguments both for and against granting benefits. Specifically, he argues that the ALJ

erred when he "rejected Mr. Smith's testimony of severe rage problems without even

mentioning his 15 day hospitalization for assaulting a teacher at job training . . . ." Doc.

No. 15 at 15. He contends that the ALJ erred by describing Dr. Barber's opinion as

unremarkable even though Dr. Barber found fatigue, depression and chronic muscle and

joint pains. *Id.* at 16. He also raises the argument addressed above about the failure to

include moderate limitations in concentration, persistence or pace in the RFC finding and

at later steps of the sequential evaluation. *Id.*

The ALJ's decision reflects that he was aware of and considered Smith's

hospitalization in 2007. In a paragraph entitled "Mental Health History," Dr. Graham

wrote that Smith "saw a mental health professional for the first time in September of

2007, and was diagnosed as being 'bi-polar.' . . . He has been in a psychiatric unit one

time in August of 2007, when he 'smashed somebody's skull into a brick wall.'" R. 219.

The ALJ specifically referenced this paragraph of Dr. Graham's report, without quoting it

in full.  R. 14.  The ALJ also addressed Smith's testimony that he "had a lot of 'rage,'" R. 13.  He found that this problem was not disabling because, among other things, Dr. Graham noted after examination no problems in attention or concentration or in recent or remote memory, Smith's activities of daily living were indicative of an ability to work and reviewing psychologists also opined that Smith could perform simple, routine, repetitive work.  R. 14.

As for the ALJ's summary of Dr. Barber's report, the "positive" findings regarding fatigue, depression and muscle and joint pains and discomfort were the symptoms as reported by Smith, not findings made after physical examination.  *See* R. 209.  The reports from the physical examination reflect no joint deformities, and normal range of motion without pain.  Muscle strength was 5/5 in upper and lower extremities.  No paravertebral muscle spasms or point tenderness were found in the back.  R. 210-11. Dr. Barber found no objective evidence of depression.  R. 211.  As for fatigue, Dr. Barber noted that Smith's symptoms were possibly exacerbated by excessive weight.  *Id.*  The ALJ specifically included that finding in his decision.  R. 13.  Accordingly, the record reflects that the ALJ appropriately considered Dr. Barber's findings upon examination in his decision.

While social security administrative hearings are inquisitorial, not adversarial, the burden rests initially with the claimant to establish that he is eligible for benefits. An ALJ has a duty to develop the record where appropriate, but he is not required to obtain additional information "as long as the record contains sufficient evidence for the administrative law judge to make an informed decision."  *Ingram v. Comm'r*, 496 F.3d

1253, 1269 (citing *Doughty v. Apfel*, 245 F.3d 1274, 1281 (11th Cir. 2001)).  As

discussed above, there is no basis to conclude in this case that the ALJ did not consider

all of the evidence in the record or that there was insufficient information before him to

make an informed decision.

**VI.    RECOMMENDATION.**

For the reasons set forth herein, it is **RESPECTFULLY RECOMMENDED** that the

decision of the Commissioner be **AFFIRMED**  I further recommend that the Court direct

the Clerk of Court to issue a judgment consistent with the order on this Report and

Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations

contained in this report within fourteen (14) days from the date of its filing shall bar an

aggrieved party from attacking the factual findings on appeal.

**RESPECTFULLY RECOMMENDED** this 1st day of November 2011.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE